**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **DUANE KELLY,** | : | **Civil Action No. 16-2553 (ES)** |
|  | : |  |
| **Petitioner,** | : |  |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| **STEPHEN JOHNSON,** *et al.*, | : |  |
|  | : |  |
| **Respondents.** | : |  |
|  | : |  |

**SALAS, DISTRICT JUDGE**

Petitioner Duane Kelly ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.E. No. 1). The Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, the Court DENIES the Petition and DENIES a certificate of appealability.

### I. Factual Background & Procedural History

The factual background and procedural history were summarized in part by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal.[1] (*See* D.E. No. 23-9).

> Defendant was convicted of killing 24-year-old Rajauhn Anderson[2] and 21-year-old Malcolm Mills on the evening of June 15, 2001. Anderson maintained a business selling marijuana and hallucinogenic mushrooms from his apartment located at 327 Watson Avenue in Plainfield. Charles Knight went to the apartment in the late afternoon of June 15 to purchase some marijuana, and defendant answered the door and let him in. Derrick Davis and Mills arrived some time later.

---

[1]    The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

[2]    Anderson also went by the nickname "Flip." (D.E. No. 23-43 at 12).

Davis testified that Anderson opened a kitchen drawer and took out what appeared to be a gun wrapped in a scarf and took it upstairs. Davis said that he did not go upstairs because Anderson insisted that anyone doing so take off his shoes and Davis did not wish to do so.

Knight, however, did remove his shoes and go upstairs with Anderson, as did Mills and defendant.  Knight testified that when the four men were upstairs, Anderson displayed a .38 caliber silver revolver that he kept wrapped in a scarf.  Knight also testified that Anderson took a box out of a closet and showed the man a black, semiautomatic handgun that had been in the box.  Anderson passed it around but would not permit defendant to handle the weapon. Anderson returned the gun to the box and placed the box back in the closet.

There was additional testimony about Anderson keeping guns in the house.  His next door neighbor, Yusef Greene, testified that Anderson kept a .38 caliber chrome revolver wrapped in a scarf and had a .40 caliber semiautomatic handgun that he kept in a box.

After Anderson showed these guns, he, Mills and Knight decided to get something to eat and Knight drove the men to a nearby health food store.  Davis left the house at the same time but he did not go with the other three men.  Defendant remained in the house.

Knight testified that he, Anderson and Mills were away for about thirty or forty minutes.  When they had finished eating their food, Knight drove them back to Anderson's home.  Anderson and Mills got out of the car and walked into the house.  Knight remained in the car, expecting them to come back, because they had asked for a ride to the barbershop.  Knight waited in the car for twenty to thirty minutes and then went and knocked on the door and rang the bell but no one answered.  He also called Anderson on his cell phone, but there was no answer.  A review of Anderson's cell phone records placed call at 5:57 p.m.  Knight waited a few more minutes and then drove off.

Jeffrey Goodman was a friend of the defendant.  He testified that he was working at the South Avenue Car Wash in Plainfield on June 15 when he saw defendant walking by quickly, carrying a book bag. Goodman could not place the time but he knew that it was still light. He said that defendant was sweating and looking behind him. Goodman spoke to defendant, but he testified defendant just waved back and continued walking quickly, not stopping to talk.

At approximately 6:00 p.m. on June 15, Anthony Sapienza drove his Ford pick-up truck to Little Italy Pizza in Fanwood.  He parked his truck and went into pick up his pizza but left his keys in the truck.  When he returned, the truck was gone.  He reported the theft and the truck's license plate number.  There was testimony that it was a ten-minute walk from Anderson's home in Plainfield to the pizza place in Fanwood.

At approximately 6:30 p.m. Patrolman Alejandro Yanes of the Clark Police Department, who had received a broadcast about the stolen truck, saw defendant driving that truck. Yanes testified that defendant looked in his direction, saw the patrol car, sped up, crossed double yellow lines and turned left. Yanes turned on his lights and siren and followed him. Yanes said the pursuit went through residential areas (at one point through several back yards) and streets with heavy traffic, that defendant's speed went up to sixty miles per hour and that he went through stop signs without stopping.  Eventually the front passenger tire on the truck blew out and the truck hit a parked car, a light post, and then a tree.

Defendant leapt out of the truck and began to run, with the police in pursuit.  Defendant ran toward a reservoir, jumped in and went out approximately twenty feet from the shore.  He eventually responded to repeated commands to come out of the water and was handcuffed.  Defendant was bleeding from his head, and the first aid squad was summoned to assist him.

Patrolman Steven Francisco of the Clark Police Department assisted Yanes in apprehending defendant.  Francisco secured the scene and retrieved the following items:

1.  a .40 caliber High Point semiautomatic handgun that had been wedged between the dashboard and the windshield of the truck;
2.  a black knapsack with contained eight bags of marijuana, weighing, .78 pounds, large and small plastic bags and a scale;
3.  a box of .40 caliber metal jacket rounds.

Sapienza, the truck's owner did not own any guns, and he did not keep any guns, drugs or scales in his truck.  After the truck was returned to him, he found a box for a High Point .40 caliber handgun, and he turned it over to the police.

Defendant was placed under arrest and charged with burglary, theft, possession of a controlled dangerous substance with intent to distribute within 500 feet of a public facility, eluding, resisting arrest, possession of a weapon in the course of a drug crime, and

certain persons not to have weapons.

The day after defendant was arrest, Patrolman Yanes saw him in the Clark jail and inquired how he was doing,  Yanes told him he would probably face ten years in jail based on the events of the day before. Yanes testified that defendant responded no, that he was going away for life.  Yanes did not understand this response.

Two days later, on June 17, Leslie Pennington, an aunt of Mills, went to Anderson's house looking for Mills.  She was accompanied by his brother, father and his brother's fiancée [sic] Knocks on the door received no response.  The front door was locked.  Pennington went to the rear and tried the back door, which was not locked.  She entered the house and heard music playing loudly.  Upstairs, she found the bodies of Anderson and Mills, each of whom had been shot to death.

Police and emergency personnel responded to the scene.  Their search of the house did not turn either the .38 caliber revolver or the .40 caliber semiautomatic handgun that Anderson had shown to defendant, Mills, and Knight on June 15.

The medical examiner could not estimate a precise time of death but testified that both men were shot at the same time, which he estimate to be from 36 to 48 hours before their bodies were discovered. Bullets were retrieved during the autopsies.

Based upon their investigation, defendant, who was in custody for the incidents which occurred in Clark, was also charged in connection with the killings of Anderson and Mills.  Ballistic testing determined that those bullets recovered at the autopsies were not fired from the .40 caliber semiautomatic handgun that had been recovered when defendant was arrested.

The homicide matter was tried first.  By the time of that trial, the murder weapon had still not been recovered.  A jury convicted defendant of the murder of Anderson and Mills, felony murder of Anderson and Mills, robbery of Anderson while armed, and possession of a .40 caliber handgun without a permit.  The jury found defendant not guilty of possession of the .38 caliber handgun without a permit and not guilty of possessing that gun with the intent to use it unlawfully.  He was also found not guilty of possession of the .40 caliber handgun with intent to use it unlawfully.

Defendant appeared for sentencing on December 12, 2003.  The trial court merged the felony murder convictions into the murder

convictions and sentenced defendant to two consecutive life terms, each with a thirty-year period of parole ineligibility.  It also sentenced defendant to a concurrent twenty years for robbery and five years for unlawful possession of a weapon.

Approximately three months later, the trial court conducted a hearing at which it determined that defendant's convictions flowing from this trial had to be set aside. During defendant's trial he had presented one defense witness, Shelley Copeland Perrey. Ms. Perrey testified that on June 23, 2001, she had been with Terrence Wilson (whom she referred to as "T") and George Pennant (whom she referred to as "G"). She said the three had been walking to buy marijuana and Wilson asked her to go away with him, saying "he had gotten himself into a situation," that he had a lot of money and could take care of her. She continued that they went to a house to smoke the marijuana and Wilson and Pennant got into an argument, Wilson saying that if Pennant had done his job, Wilson would not have to leave town. She said that Wilson asked her if she had heard about the two young men who had been shot, and she said yes. She said that Wilson then told her that a woman he knew had asked him to rob "her man" and that he and Pennant went to Anderson's house. He said that while the robbery was in progress, Pennant let someone enter the house and that person pulled off the mask Wilson had been wearing and that, as a result, "they had to do them," meaning kill Anderson and Mills.

Perrey had supplied a statement to the police to this effect during their investigation and, based upon that statement, defendant and Wilson were indicted as co-defendants, but their trials were severed, with defendant being tried first. After defendant was convicted and sentenced, but before Wilson's trial commenced, Perrey wrote a letter to the prosecutor's office and the trial court, stating she did not want to testify at Wilson's trial because she did not want to be untruthful. The prosecutor's office then interviewed Perrey and determined that her story about this conversation was not true. Because the prosecution's case against Wilson was premised upon her testimony, it dropped all charges against him.

Based upon this presentation, the trial court sua sponte concluded that defendant's convictions for murder, felony murder and robbery had to be vacated because false testimony had been presented. The prosecution did not oppose that determination, although it was the defense which had presented the false testimony.  Neither did the prosecution seek leave to appeal from that ruling. The trial court concluded that the false testimony tainted the convictions for murder, felony murder and robbery and set them aside.  Defendant

had, in the interim, been tried on the charges coming out of Clark and had been convicted on all counts. The trial court concluded that the tainted testimony did not affect those convictions.

The month after the trial court vacated these convictions, the murder weapon, which had not been available at the first trial, was recovered at 326 Leland Avenue in Plainfield. This property abutted the rear of 327 Watson Avenue. Roy Stange purchased the building at 326 Leland and hired a crew to clean up the grounds, which had been neglected and were overgrown. One of the work crew found a handgun, which he gave to his foreman who, in turn, gave it to Stange. Stange delivered it to the police. It was a .38 caliber Smith and Wesson revolver that was dirty and rusted. The cylinder contained three spent shells and three whole cartridges. Ballistics testing determined that the bullets that killed Anderson and Mills had been fired from this gun.

Prior to defendant's second trial getting under way, the trial court ruled that the State could only proceed against defendant on the retrial on the theory that defendant was the shooter. The trial court noted that at the first trial, the State had proceeded both on the theory that defendant was the shooter and on the theory of accomplice liability. According to the trial court, the only evidence supporting a theory of accomplice liability was that of the discredited witness Perrey. Absent that evidence, the trial court ruled, the State was restricted to attempting to prove that defendant committed the murders himself.

At defendant's second trial, he was again convicted of the murders of Anderson and Mills, of felony murder and of robbery. He was not tried on the weapons charges for which he had been acquitted at the first trial. The trial court sentenced defendant as it had after the first trial and this appeal followed.

*State v. Kelly*, 967 A.2d 898, 901–05 (N.J. Super. Ct. App. Div. 2009); (D.E. No. 23-9).

Petitioner was convicted of two counts of first-degree murder in violation of N.J. Stat. Ann. §§ 2C:11-3a(1) and 2C:2-6; one count of first-degree robbery in violation of N.J. Stat. Ann. §§ 2C:15-1 and 2C-6; and two counts of first-degree felony murder in violation of N.J. Stat. Ann. § 2C:15-2. *See Kelly*, 967 A.2d at 901.

The Appellate Division affirmed Petitioner's conviction and sentence on April 6, 2009. *Id.*

at 911.  On September 28, 2009, the New Jersey Supreme Court granted Petitioner's Petition for

Certification for the limited issue of whether Petitioner's second prosecution violated the Double

Jeopardy Clause of the United States and New Jersey Constitutions.  *See State v. Kelly*, 982 A.2d

458 (N.J. 2009), (*see also* D.E. No. 23-13).  On May 4, 2010, the New Jersey Supreme Court

affirmed the Appellate Division's judgment, holding that Petitioner's second trial was not barred

by the principles of collateral estoppel.  *State v. Kelly*, 992 A.2d 776, 789-90 (N.J. 2010).  On June

24, 2010, Petitioner then filed a *pro se* petition for post-conviction relief ("PCR") that was denied

on the merits.  *State v. Kelly*, A-3809-12T1, 2015 WL 3495642, *3 (N.J. Super. Ct. App. Div. June

4, 2015).  On October 29, 2015, the New Jersey Supreme Court denied Petitioner's subsequent

petition for certification.  *State v. Kelly*, 124 A.3d 240 (N.J. 2015).

Petitioner filed the instant petition for habeas relief under § 2254 on May 5, 2016.  (D.E.

No. 1).  Respondents filed a motion to dismiss arguing that the petition was time-barred by the

Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA").  (D.E. No. 9-1).

Petitioner file a motion for equitable tolling in response.  (D.E. No. 13).  This Court denied both

Respondents' motion to dismiss and Petitioner's motion for equitable tolling without prejudice,

because neither party verified when Petitioner's notice of appeal *nunc pro tunc* of the PCR Court's

decision was filed in the Appellate Division.  (D.E. No. 16 at 2–3).  Respondents filed an Answer

(D.E No. 22), to which Petitioner replied (D.E. No. 26).

## II.    Standard of Review

Section 2254(a) permits a court to entertain only claims alleging that a person is in state

custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

2254(a).  Petitioner has the burden of establishing each claim in the petition.  *See Eley v. Erickson*,

712 F.3d 837, 846 (3d Cir. 2013).  Under 28 U.S.C. § 2254, as amended by the Antiterrorism and

Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts.  *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

> Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:
>
> > (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> >
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Parker v. Matthews*, 567 U.S. 37, 40–41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  If a decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.   As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A).  To do so, a petitioner must "fairly present' all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004).  This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*,

504 F.3d at 365–66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007)) (other citations omitted).  If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## III.    Analysis

The Petition raises four grounds for relief:

1.  "The N.J. State Supreme Court erred when it denied defendant's motion to reverse conviction from second trial that should have been barred on principles of collateral estoppel incorporated in U.S. Const. Amendment V's Double Jeopardy."  (D.E. No. 1 at 7).

2.  "The N.J. Supreme Court erred in denying defendant's motion to reverse conviction from second trial based on principles of collateral estoppel incorporated in U.S. Const. Amend V's Double Jeopardy Clause."  (*Id.* at 11).

3.  "The trial court erred in denying defendant's Petitioner for Post-Conviction Relief, without affording him an evidentiary hearing to fully address his contentions that he failed to receive adequate legal representation at the trial level."  (*Id.* at 14).

4.  "The cumulative effects of multiple errors complained of rendered the trial unfair."  (*Id.* at 18).

For the reasons explained below, the Court finds that Petitioner's claims do not warrant federal habeas relief.

**A.      Grounds One and Two: Double Jeopardy Clause Violations**

Grounds one and two of Petitioner's federal habeas petition both relate to the purported

Double Jeopardy Clause violations inherent in Petitioner's second trial.  (D.E. No. 1 at 7–12).

Because the two claims are so interrelated, this Court will analyze them simultaneously.

<u>State Court's Determination</u>

The Double Jeopardy issue, which was the sole issue analyzed by the New Jersey Supreme

Court after granting Petitioner certification, was analyzed and rejected as follows:

> Generally, the Double Jeopardy Clause does not "bar reprosecution of a defendant whose conviction is overturned on appeal" because, until the proceedings have run their full course, the defendant remains in a state of "continuing jeopardy." *Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 308 (1984). A defendant's successful motion for mistrial, moreover, typically will "remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." *United States v. Dinitz*, 424 U.S. 600, 607 (1976).   The State, however, cannot reprosecute a defendant on a charge that is reversed because of insufficient evidence to support the conviction. *See Lydon*, *supra*, 466 U.S. at 308–09.

> Those basic principles help frame the issues in the case before us. No one disputes that in light of the acquittals for unlawful possession of a .357 or .38 caliber handgun and possession of that weapon for an unlawful purpose, defendant cannot be retried on those charges. No one suggests that there was insufficient evidence to support the murder, felony-murder, and armed-robbery convictions in the first trial. Defendant, however, claims that the concept of "continuing jeopardy" should not apply to the reversed convictions. Relying on *Ashe v. Swenson*, 397 U.S. 436 (1970), and the doctrine of collateral estoppel, defendant asserts that the acquittals determined an issue of ultimate fact—that defendant was not the shooter—precluding a retrial of defendant as a principal in the robbery and killings of Anderson and Mills.

> In *Ashe v. Swenson*, the United States Supreme Court recognized that the Fifth Amendment's Double Jeopardy Clause incorporates the doctrine of collateral estoppel. *Id.* at 444–46. Thus, "when an issue of ultimate fact has [ ] been determined by a valid and final judgment" in one trial, the State may be collaterally estopped from

relitigating that same exact issue in a second trial. *Id.* at 443. The crucial inquiry is "whether a rational jury could have grounded its verdict [of acquittal] upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* at 444 (citation and internal quotation marks omitted).

In *Ashe*, the Supreme Court barred successive robbery prosecutions on collateral estoppel grounds. In that case, the prosecution proceeded on the theory that defendant was one of the masked gunmen who robbed six players at a poker game. *Id.* at 438. Defendant was charged with six separate acts of robbery. *Ibid.* However, he was tried for robbing only one of the victims and acquitted of that charge by the jury. *Id.* at 438–39. The prosecution then tried the defendant for robbing another victim at the poker game and secured a conviction. *Id.* at 439–40. A review of the record of the first trial revealed that "[t]he single rationally conceivable issue in dispute before the jury was whether the [defendant] had been one of the robbers. And the jury by its verdict found that he had not." *Id.* at 445. The Court concluded that after the first "jury determined by its verdict that the [defendant] was not one of the robbers, the State could [not] constitutionally hale him before a new jury to litigate that issue again." *Id.* at 446–47.

In *Ashe*, giving preclusive effect to the first jury's finding that the defendant was not the robber of the six men at the card game barred the State from making multiple attempts to convict the defendant in successive prosecutions relating to a single criminal act. *Id.* at 445–47. In effect, the Court prohibited the State from fractionalizing the criminal event and conducting a separate trial for each victim in order to maximize the potential of securing a conviction. Therefore, the second robbery prosecution violated the double-jeopardy proscription. *Id.* at 446–47.

In contrast to the *Ashe* scenario, the United States Supreme Court has held that the doctrine of collateral estoppel is not applicable when a jury, in a single trial, returns a verdict of acquittals and convictions that are inconsistent with one another. *United States v. Powell*, 469 U.S. 57, 62–67 (1984). Our system of justice has long accepted inconsistent verdicts as beyond the purview of correction by our courts, and therefore a defendant is forbidden from collaterally attacking a guilty verdict on one count with an apparently irreconcilable acquittal on another count. *Id.* at 58 (citing *Dunn v. United States*, 284 U.S. 390, 393 (1932)); *see also State v. Banko,* 182 N.J. 44, 53 (2004) ("'Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.'") (quoting *Dunn, supra,* 284 U.S. at 393).

In *Powell*, the Court acknowledged that, given contradictory verdicts, no amount of rational exegesis may explain the actions of a jury. The Court recognized that inconsistent verdicts, such as an acquittal of a predicate offense and a guilty finding of a greater offense, could not be viewed simply as a jury giving "a windfall to the Government" when it is just as likely that a jury—despite overwhelming evidence of guilt—found a defendant not guilty "through mistake, compromise, or lenity." 469 U.S. at 65. The Court refused to vacate the defendant's conviction in *Powell* "merely because the verdicts [could not] rationally be reconciled." *Id.* at 69.

Thus, in cases of inconsistent verdicts returned by the same jury at the same trial, the doctrine of collateral estoppel or issue preclusion has no meaning, because it cannot be determined why a jury returned an acquittal. *Id.* at 68; *see also State v. Muhammad*, 182 N.J. 551, 578 (2005) ("Our jurisprudence does not allow us to conjecture regarding the nature of the deliberations in the jury room."). Without the determination of an ultimate fact that can rationally foreclose some other issue from consideration, double-jeopardy principles do not apply.

The present case is not a successive prosecution, as in *Ashe*, where the prosecution "treated the first trial as no more than a dry run for the second prosecution." 397 U.S. at 447. Rather, the record reveals that, like *Powell,* this case is about irreconcilable verdicts that make untenable the application of the collateral-estoppel doctrine.

The burden is on defendant to prove that the issue sought to be precluded was actually decided in the first trial. *Dowling v. United States*, 493 U.S. 342, 350–51 (1990). That he cannot do here.

Given the trial record, the judge's charge, and the verdicts rendered, we cannot find a rationally fact-based explanation for why, on the one hand, the jury acquitted defendant of both unlawful possession of a .357 or .38 caliber handgun and possession of that weapon for a purpose to use it unlawfully against the victims and, on the other hand, convicted him of both the armed robbery and murders with that weapon. The logic of defendant's position is that the jury must have found—based on his introduction of Perry's perjured testimony—that defendant was an accomplice to the armed robbery and murders (and not the actual shooter) in order to explain why the jury acquitted him of the gun charges. However, the court charged the jury that accomplice liability applied not only to the armed-robbery and murder charges, but also to the charges of possession of a .357 or .38 caliber handgun for a purpose to use it unlawfully

against Anderson and Mills.

The court gave the jury the option of finding defendant guilty as an accomplice in the possession of a .357 or .38 caliber handgun for an unlawful purpose. In addition, the court instructed that the unlawful purpose—based on the State's theory of the case—would be the use of the .357 or .38 caliber handgun in the robbery of Anderson and the killings of Anderson and Mills. The State never offered a theory that the .40 caliber handgun found in defendant's possession was used in the robbery or murders.

Moreover, we cannot determine from the verdict sheet whether the jury convicted defendant of the robbery and murders as an accomplice or principal, or whether some of the jurors convicted on the basis of accomplice liability and others as a principal. Unanimity on whether a defendant is guilty as an accomplice or principal is not required in this State. *See State v. Brown*, 138 N.J. 481, 520–22 (1994); *see also State v. Josephs*, 174 N.J. 44, 92 (2002) ("[E]ven if the jury disagrees about whether the defendant committed murder by his own conduct or as an accomplice, it may still find the defendant guilty of murder.").

Based on the evidence, the jury charge, and verdict, defendant was found guilty—as an accomplice or principal (or both)—of robbery while armed with a .357 or .38 caliber handgun and the felony murders, which were committed with the use of a .357 or .38 caliber handgun. Defendant's argument requires this Court to conclude that defendant was convicted of the murders and robbery as an accomplice, which, in his view, would therefore be consistent with the acquittal on possession of the murder weapon. However, we doubt that a jury, rationally deciding the issues in this case, could conclude that defendant committed the robbery and murders with a .357 or .38 caliber handgun, as an accomplice, but that he did not, as an accomplice, possess a .357 or .38 caliber handgun for the unlawful purpose of committing the robbery and murders. The acquittal on the charge of possession of a .357 or .38 caliber handgun for the purpose to use it unlawfully against another is seemingly inconsistent with the guilty verdicts on the armed robbery and murders.

In addition, given the court's charge to the jury, to rationalize the verdicts, we would have to find that defendant was not in constructive and joint possession of the .357 or .38 caliber handgun but yet guilty as an accomplice as a result of crimes committed with that weapon. Although it would not have been impossible for the jury to make such a distinction, it would have required hairsplitting

14

of the highest order.

Indeed, after conclusion of the first trial, defendant sought a judgment of acquittal on the homicide convictions based on the theory that they were inconsistent with the acquittals. Then defense counsel stated, "it was logically inconsistent if [defendant] didn't possess [the murder] weapon or if he did not possess that weapon with some other person" that he committed the murder, either as a principal or an accomplice. Only after the convictions were set aside did defendant argue that the acquittals and convictions were perfectly reconcilable. We do not find such clarity in the jury's verdict.

Much of this discussion should suggest that divining whether the jury decided an ultimate issue by a verdict of acquittal will seldom be possible. Defendant in this case has not met his burden of showing that the jury's not guilty verdict of possession of a .357 or .38 caliber handgun for the purpose to use it unlawfully against another was based on a rational determination of an ultimate fact— that he was not the actual shooter.

The Appellate Division suggested that speculative theories could be spun to justify the jury's acquitting defendant of possession of a .357 or .38 caliber handgun, such as the State's failure to present the weapon in evidence or the jury's satisfaction that it had found defendant guilty of a sufficient number of serious crimes. *Kelly*, *supra*, 406 N.J.Super. at 346. In the end, like the Appellate Division, we do not engage in such speculation and do not give preclusive effect to an acquittal that may have been the product of lenity, compromise, or mistake.

Even if defendant had met his burden of persuasion and proved that the acquittals showed unmistakably that the first jury believed that he was not the actual shooter, but rather an accomplice, we would have grave doubts whether an ultimate issue that was determined by a jury seemingly based on perjured testimony is entitled to preclusive effect in a retrial, such as here. In this case, Perry's perjured testimony—introduced innocently by defendant himself— opened the door to a theory of accomplice liability that tainted not only the convictions, but also the acquittals, thus undermining the integrity of the trial process. It is true that the doctrine of double jeopardy precludes a retrial of defendant's acquittals even if they were based on the "egregiously erroneous foundation" of perjured testimony. *See Fong Foo v. United States*, 369 U.S. 141, 143 (1962). However, to preclude the retrial of convictions that were reversed based on perjured testimony is a different matter altogether.

15

Collateral estoppel is grounded in principles of equity. *Olivieri v. Y.M.F. Carpet, Inc*., 186 N.J. 511, 521–22 (2006). The doctrine proceeds on the theory that once a jury makes a finding of ultimate fact, in a fully and fairly tried case, that finding should not be subject to relitigation. *See Ashe*, *supra*, 397 U.S. at 443. Respect for the prior finding is based on notions of fairness and the need for finality. *See Yeager v. United States*, 129 S.Ct. 2360, 2365–66 (2009); *DiFrancesco*, *supra*, 449 U.S. at 128 (discussing purpose behind Double Jeopardy Clause).

However, an ultimate fact founded on perjured testimony is not fairly procured, and it is doubtful that collateral estoppel requires one unjust result to perpetuate another unjust result. *See Restatement (Second) of Judgments* § 28(5)(c) & comment j (1982) (discussing exception to issue preclusion when, for example, concealment of material information in first trial denies party adequate opportunity for "full and fair adjudication," and issue preclusion causes a patently unfair result); *see also United States v. Ruhbayan*, 325 F.3d 197, 203–04 (4th Cir. 2003) (holding that defendant's acquittal did not bar subsequent perjury trial of defendant when defendant and another key witness gave false testimony denying State full and fair opportunity to litigate), *cert. denied*, 540 U.S. 899 (2003); *State v. Bolden*, 639 So.2d 721, 725 (La. 1994) (holding that defendant's perjury trial not precluded by his acquittal of murder because defendant's after-trial confession was new evidence that "defendant had testified falsely under oath" at his murder trial), *cert. denied,* 513 U.S. 1077 (1995).

The constitutional equities do not favor the application of collateral estoppel in this case. Here, unlike in *Ashe*, the State prosecuted defendant in a single trial on all potential theories. The first trial was not a trial run for a successive prosecution to gain some advantage over defendant. The perjured testimony that compelled the new trial on the convicted counts was presented during defendant's case, not the State's case. Moreover, regardless of what version of the facts it accepted, the first jury convicted defendant of murder and robbery. To deny a retrial because a defense witness's perjured testimony necessitated the overturning of the murder and robbery convictions would be a perversion of the equitable principles underlying the doctrine of collateral estoppel. That would be so even if the State were to take a different approach on retrial based on new evidence. All in all, there is no reason that would militate toward giving preclusive effect to an issue that may have been decided on perjured testimony. We do not disturb the benefit defendant received from the acquittals and reversal of convictions based on perjured

testimony. But the Double Jeopardy Clause does not give defendant the constitutional windfall of barring a new trial on the murder and robbery charges.

We also reject defendant's comparison of his case to *Yeager v. United States*, 129 S.Ct. 2360, 2367 (2009), which held that acquittals in a mixed verdict that also contains hung counts may, in appropriate circumstances, be given preclusive effect under the collateral-estoppel doctrine. In *Yeager,* the United States Supreme Court specifically reaffirmed the doctrine "that a logical inconsistency between a guilty verdict and a verdict of acquittal does not impugn the validity of either verdict." *Id.* at 2362 (citing *Dunn*, *supra*, 284 U.S. at 393–94). The Court determined that, unlike a conviction, a hung count is a "nonevent," *Yeager*, *supra*, at 2367, and therefore "has no place in the issue-preclusion analysis," *id.* at 2368. *Yeager* has no application to a case, such as here, involving an inconsistent verdict of acquittals and convictions returned by the same jury. *Cf. Evans v. United States,* 987 A.2d 1138, 1142 (D.C. 2010) (holding *Yeager* inapplicable where jury returned inconsistent verdicts).

In conclusion, we affirm the judgment of the Appellate Division, upholding defendant's murder, felony-murder, and armed-robbery convictions. Defendant's second trial was not barred by the principles of collateral estoppel, which are incorporated in the Double Jeopardy Clause. Because of the seemingly inconsistent verdicts in the first trial, defendant cannot establish that the jury determined an ultimate fact that precluded a retrial of the reversed convictions. Moreover, even if the verdicts were not inconsistent, we would not be inclined to apply the constitutional-equitable doctrine of collateral estoppel when the ultimate issue defendant seeks to preclude from relitigation is one that might well have been founded on a defense witness's perjured testimony, testimony that tainted both the acquittals and convictions in the first trial.

*See Kelly*, 992 A.2d at 784–790 (footnotes omitted).

The Fifth Amendment to the United States Constitution's Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  The Clause "guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as

enhancing the possibility that even though innocent he may be found guilty." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977) (internal quotation marks omitted).

The Double Jeopardy Clause also encompasses the doctrine of collateral estoppel in criminal proceedings. *Schiro v. Farley*, 510 U.S. 222, 232 (1994). Collateral estoppel is defined as "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443.

Petitioner's argument is that he should not have been retried because he was acquitted at the first trial on the counts related to possession of the murder weapon. Consequently, he could not be culpable for the decedents' murders because the first jury did not think he possessed the murder weapon. Petitioner reasserts, as he did in his petition for certification before the state court, that his second prosecution was precluded by the doctrine of collateral estoppel. (D.E. No. 23-54 at 21–41).

Petitioner first submits that "[t]he N.J. Supreme Court erred in its assessment that the first trial verdicts were inconsistent and that the first jury did not determine an ultimate fact that precluded a retrial." (D.E. No. 1 at 7). Petitioner cites to excerpts from the New Jersey Supreme Court's opinion where the Court provided- "the Court cannot determine from the verdict sheet whether the jury convicted defendant of the robbery and murders as an accomplice or principal, or whether some of the jurors convicted on the basis of accomplice liability and others as a principal. Unanimity on whether a defendant is guilty as an accomplice or principal is not required in this State." (*Id.*). Petitioner then goes on to cite an excerpt from his first trial, where the jury foreman indicated to the court that it was unanimous in its not guilty verdicts for the two weapons charges related to the .38 caliber and .40 caliber guns, respectively. (*Id.* at 7–8).

18

Petitioner uses the aforementioned excerpts to advance the argument that the first trial jury's unanimous not guilty verdict on some of the weapons' possession counts, underscores that they did not determine that Petitioner used the guns for the unlawful purpose of murdering the two decedents.  (*Id.* at 8).

Despite Petitioner's interpretation of the New Jersey Supreme Court's statement, this Court interprets the New Jersey Supreme Court's general restatement of New Jersey state law to mean that unanimity was not required to convict a defendant on a theory of accomplice or principal liability. *See Kelly*, 992 A.2d at 787.  Moreover, the New Jersey Supreme Court's statement about jury unanimity appeared to be in response to Petitioner's argument that the jury's inconsistent verdicts did not support a murder conviction. The Court provided: "The logic of defendant's position is that the jury must have found- based on his introduction of Perrey's perjured testimony- that defendant was an accomplice to the armed robbery and murders (and not the actual shooter) in order to explain why the jury acquitted him of the gun charges." *See id.* at 786.  Nonetheless, Petitioner's argument does not implicate any constitutional rights, particularly not the Double Jeopardy Clause.

Petitioner also argues that the New Jersey Supreme Court gave undue weight to defense witness Sherry Copeland-Perrey's perjured testimony when rationalizing why the first trial's inconsistent verdicts precluded a double jeopardy bar to a second trial. (D.E. No. 1 at 11–12). Petitioner insists that "the doctrine of double jeopardy precludes a retrial of Petitioner's acquittals even if they were based on the egregiously erroneous foundation of perjured testimony."  (*Id.* at 11).[3]  This aspect of Petitioner's claim is premised on the state court's observation that the first

---

[3]     Petitioner also appears to insinuate that the state did not strongly object to Perrey's testimony at his first trial, because although it may have lessened Petitioner's culpability in his trial, it strengthened their upcoming trial against Terrance Wilson.  (*Id.* at 11).  This allegation has no bearing on Petitioner's federal habeas petition.

trial court issued an accomplice jury instruction only after Perrey implicated Terrance Wilson in the double murders.  *See Kelly*, 992 A.2d at 780.

The first jury trial's unanimous not guilty findings on some of the weapons charges, did not absolve Petitioner on the murder and robbery counts.  To the extent that Petitioner is arguing that it should have, the New Jersey Supreme Court did not agree.  *See id.* at 788.  This  Court cannot determine that the state court's determination was an unreasonable application of clearly established federal law.

The New Jersey Supreme Court's analysis considered the United States Supreme Court's then-recent opinion in *Yeager v. United States*, 557 U.S. 110 (2009), before ruling that Petitioner did not have a meritorious double jeopardy claim.   In *Yeager*, the Supreme Court held that inconsistent verdicts, where the jury acquitted on some counts and failed to reach a verdict on other counts, did not preclude further prosecution on the counts where the jury failed to reach a verdict. *Id.* at 122.

In *Dunn v. United States*, 284 U.S. 390 (1932), the Supreme Court, in discussing the concept of inconsistent jury verdicts, opined that:

> The most that can be said in [ ] cases [in which the jury renders an inconsistent verdict] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

*Id.* at 393 (internal quotation and citation omitted); *see also Powell*, 469 U.S. at 64–65 (quoting *Dunn*, 284 U.S. at 393).

Since the state court's ruling in Petitioner's case, the United State Supreme Court has provided further guidance on the issue before this Court.  In *Bravo-Fernandez v. United States*,

137 S.Ct. 352, 362–63 (2016), the Supreme Court held that the issue-preclusion component of the Double Jeopardy Clause does not bar a retrial after a jury has returned "irreconcilably inconsistent verdicts of conviction and acquittal, and the convictions are later vacated for legal error unrelated to the inconsistency."

As in the foregoing case, the Petitioner here has not sufficiently established that the state's second trial on the counts that he was previously convicted of, constituted a Double Jeopardy Clause violation.  Moreover, the trial court granted the defense's motion to vacate the verdict only after learning that the defense witness provided perjured testimony that arguably influenced the theory of liability.  Without Perrey's perjured testimony, the trial court would have more likely than not only instructed the jury on principal liability rather than on both principal and accomplice liability, as it did.  Therefore, the state court's observation of this significant detail that affected the posture of Petitioner's first trial was not inappropriate.  Consequently, there is no information before this Court that the retrial violated Petitioner's right to not be subjected to Double Jeopardy. The state court's decision was not an unreasonable application of clearly established federal law. Petitioner's claim for relief is denied.

### B.    Ground Three: Ineffective Assistance of Counsel

Petitioner next makes an ineffective assistance of counsel claim against his trial and PCR counsel.  The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the defendant must show that counsel's performance was deficient.  This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687.  Second, the defendant must show that he was prejudiced by the deficient performance.  *Id.*  This requires showing that counsel's errors deprived

the defendant of a fair trial.  *Id.*

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance."  *Id.* at 690.  In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight."  *Id.*  The petitioner bears the burden of showing that counsel's challenged action was not sound strategy.  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *Id.* at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard."  *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).  "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself."  *Id.*  "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'"  *Id.* (quoting *Pinholster*, 563 U.S. at 190).  Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)."  *Id.* (internal quotation marks and citations omitted).  "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed.'"  *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

### 1.    Ineffective Assistance of Trial Counsel

Petitioner alleges in ground three of his petition, that he was deprived of his Sixth Amendment right to counsel due to his trial counsel's ineffective assistance.  (D.E. No. 1 at 14–15).  Petitioner argues that counsel failed to call numerous witnesses who would have put the state's theory of the decedents' time of death into question.  (D.E. No. 1 at 14–15).  He adds that PCR counsel's failure to adequately pursue his ineffective assistance of trial counsel claim was equally ineffective.  (*Id.* at 15–16).

Petitioner lists John and Tonya Bush, Roslyn Bradshaw and Dr. Graciela Linares as possible witnesses that his counsel failed to call as witnesses.  (*Id.* at 14–15).  He further names Detective David Carmen as a state witness whom trial counsel failed to adequately cross examine.  (*Id.* at 14).  Petitioner submits that all of these witnesses' purported testimony would have served to undermine the state's theory of when the decedents' died.  (*Id.* at 14–15).

The Appellate Division affirmed the PCR denial, determining that the trial court correctly determined that defendant was not denied the effective assistance of counsel because his attorney failed to present testimony from these individuals.  *Kelly*, 2015 WL 3495642 at *5–7.

The Undersigned also reviewed the PCR Court's decision to identify additional details that supported its decision to deny Petitioner's motion.  (D.E. No. 23-52).  Citing to the PCR Court's thorough decision, the Appellate Division articulated that it too was not swayed by Petitioner's claim that trial counsel's ineffectiveness prevented him from successfully undermining the state's case.  *See Kelly*, 2015 WL 3495642 at *7.  The PCR Court's decision, which cited heavily to Petitioner's trial record, demonstrated the weakness of Petitioner's ineffective assistance claim.

(D.E. No. 23–52).

### a.   John and Tonya Bush

Petitioner provides in his federal habeas petition that the Bush's would have testified that the decedents were still alive on Saturday, June 16, 2001, despite the state's contention that both men died a day prior.  (D.E. No. 1 at 14).  Although the instant petition does not specify exactly how the Bushes were aware that the decedents were still alive on Saturday, June 16th, this Court reviewed Petitioner's state court proceedings to determine the contours of Petitioner's claim.  At his PCR hearing, Petitioner's counsel argued that John and Tonya Bush did not hear music coming from Anderson's apartment on Friday, June 15th, but, at some point "later that day or early in the morning hours of Saturday, when the defendant was already in custody, that's when the music first went on."  (D.E. No. 23-51 at 8).

The PCR Court rejected this argument providing:

> The de—the petitioner contends that as set forth in DA-95 and 96, which are the statements of John and Tonya Bush dated June 17, 2001,  that the testimony or the statement from John Bush showed that there was no noise from the apartment on June 15, 2001 and that loud music was heard at about 5:20 a.m. on Saturday for three to four minutes, then it was lower in volume, then got loud and stayed on all weekend.  Tonya Bush at I believe it was DA-97 to 100, gave a statement that Saturday at about 5 a.m. there was loud music, which started to play and continued during the day.

> As to the argument with regard to John and Tonya Bush's evidence, John Bush also said that the victim's car window was open all weekend and that there was a box of jerseys left on the trunk lid.  He first noticed the box at about 3:30 and it was still there at 9:30 p.m.

> This corroborates the State's theory that the victims went into the apartment and never came out because they were shot.  Charles Knight (phonetic), known as Fuji (phonetic), was still waiting outside for the victims to come out.  He had been with them just prior to their entry into their residence.

> He tried to call the victim at about 5:57 and there was no answer, as

24

> did Tonya Bush.  She also said that she rang the bill [*sic*] and that
> no one answered at about 6 a.m.  She also saw the box on top of the
> car at about 4:15 and the box stayed there all weekend. That, too
> corroborates the State's version.
>
> As to the volume of mu—of music, that certainly does not establish
> that the victims were alive.  The State had other witnesses that
> testified with regard to this matter, as we see in 12T, Page 76, Line
> 17 to Page 77, Line 22.

(D.E. No. 23-52 at 9–10).  The record reflects that although the Bush's were not called to testify,

the decedent Anderson's neighbor and friend, Ernest Cagle, testified at Petitioner's trial.  (D.E.

No. 23-46 at 108–117).  Cagle testified that he heard music coming from Anderson's apartment

on Saturday June 16th, that was a little louder than he what he was used to hearing from Anderson's

apartment.  (*Id.* at 116).  Cagle also testified that he saw Mill's parked car in front of Anderson's

building on the day of the shooting with a box sitting on the car.  (*Id.* at 114).  Cagle further testified

that he saw the box sitting on top of Mill's car a day later despite rain and thunder storms the

previous night.  (*Id.* at 113).

Additionally, as the PCR Court noted, Anderson's landlord, Abdon Lapaix also testified

about his attempts to access Anderson's apartment on the evening of June 16th after complaints of

loud music coming from the apartment.  (D.E. No. 23-47 at 22–23).  Lapaix testified that he worked

off the premises on Saturday, June 16th and received complaints from the other tenants at about

9:00 that evening.  (*Id.* at 28 & 30).  Lapaix, who was accompanied by the police, testified that he

was unable to gain access to the apartment as it appeared that the locks to the front door had been

changed.  (*Id.* at 24–25).  The police declined to provide further assistance as they determined that

the music coming from Anderson's apartment was not loud enough.  (*Id.* at 25).

Like the state court, this Court cannot determine how counsel was ineffective for failing to

present John and Tonya Bush's purportedly exculpatory testimony.  The state court did not err in

finding that trial counsel's performance was not prejudicial to Petitioner.  (D.E. No. 23-52 at 30). Petitioner did not suffer from trial counsel's failure to call John and Tonya Bush because even without their testimony, the jury heard testimony from other witnesses about the loud music coming from Anderson's apartment after the presumed time of death.  Here, the Bushes testimony would not have amounted to a "reasonable probability that, but for counsel's error's, the trial's outcome would have been different."  *See Strickland*, 466 U.S. at 694.  Consequently, the state court did not unreasonably apply clearly established federal law.

### b.    Roslyn Bradshaw

Petitioner next contends that Roslyn Bradshaw[4] "told police on June 17, 2001 that she personally saw and spoke to both Mr. Anderson and Mr. Mills on June 15, 2001 at app. 8:30 pm 3 hours after the State claims they were already dead."  (D.E. No. 1 at 14).  At the PCR hearing, the prosecutor proffered that Bradshaw's statement in a police report that she had spoken with the victims on the night of Friday, June 15, 2001, was debunked by the context of the purported conversation she had with the victims that it could not have been on the night of the murders but rather a day or two prior.  (D.E. No. 23-51 at 11).  Further, the prosecutor commented that "in the context of this investigation, made it absolutely clear to everyone who was involved in this case at the time, that she was wrong on the date."  (*Id.*).

The PCR Court rejected the ineffective assistance claim related to Bradshaw as follows:

> As to Roslyn Bradshaw, this is all hearsay that she talked to the victims at 8:30 and that the defendant was in custody.  We have no affidavit from Ms. Bradshaw that – confirming her talk with the victim, confirming the time, and confirming her availability to testify.  So there's no affidavit or other evidence to support this contention.

(D.E. No. 23-52 at 16).

---

[4]    Also spelled as "Rosalind."  (D.E. No. 23-51 at 11).

The Appellate Division adopted the PCR Court's analysis that Ms. Bradshaw's purported statement in a police report was unsubstantiated hearsay. *See Kelly*, 2015 WL 3495642 at *6.

This Court agrees that Petitioner has not demonstrated how he was prejudiced by trial counsel's failure to call Ms. Bradshaw. Ms. Bradshaw's supposed recollection of a conversation with the victims would have been considered alongside other evidence that the victims had already been shot by that Friday evening. This evidence includes testimony from Anderson's friend, Derrick Davis, who testified that he unsuccessfully repeatedly called Anderson on Friday June 15th after being in Anderson's home with him earlier that day. (D.E. No. 23-44 at 44–46 & 71). Additionally, Anderson's on-again, off-again girlfriend, Melissa Joseph, testified that she spoke with Anderson on Friday, June 15, 2001, numerous times up until around 4:30 in the afternoon. (D.E. No. 23-44 at 148). She subsequently made several attempts to speak to Anderson by telephone later that day and was unsuccessful. (*Id.* at 149). Further, the prosecutor's unrefuted arguments at the PCR hearing that Ms. Bradshaw's comments in the police report were questionable to "everyone who was involved in this case at the time" suggests that trial counsel employed a strategic decision to not call Ms. Bradshaw as a witness. *See Lewis v. Mazurkiewicz*, 915 F.2d 106, 114 (3d Cir. 1990) ("*Strickland* suggests that courts should allow very broad latitude for strategic choices made after adequate investigation.") Petitioner has not demonstrated that trial counsel's failure to call this witness prejudiced his case "in light of the totality of the evidence before the judge or jury." *See Strickland*, 466 U.S. at 695. Finally, as the state court noted, Petitioner did not provide an affidavit to the PCR court detailing what information Ms. Bradshaw would have provided if called to testify. *See Kelly*, 2015 WL 3495642 at *6. Under these circumstances, the state court's determination that trial counsel was not ineffective was not an unreasonable application of clearly established federal law.

### c.  Dr. Graciela Linares and Detective David Carmen

Petitioner further contends that Dr. Graciela Linares and Detective David Carmen's testimony could have cast further light on the issue of the decedents' time of death.  (D.E. No. 1 at 14–15).  Petitioner contends that although Dr. Linares' report does not state a time of death for either decedent, Detective Carmen, who was also present during the autopsies could have been effectively cross-examined about his recollection of Dr. Linares' opinion of Anderson's time of death.  (*Id.*).  According to Petitioner, Dr. Linares verbalized that Anderson died between 12:00 p.m. and 6:00 p.m. on June 16, 2001, hours after Petitioner was in police custody.  (*Id.* at 14).

Dr. Linares, who was the medical examiner who performed the autopsies on both decedents, retired by the time of Petitioner's trial and was not available to testify at the trial.  (D.E. No. 23-51 at 8).  Her successor, Dr. Leonard Zaretski, testified about her findings and also provided his own expert opinion based on Dr. Linares' report.  (D.E. No. 23-46 at 34–63).  Detective Carmen, who was also a witness at Petitioner's trial, testified about observing Dr. Linares and her assistant performing the decedents' autopsies.  (*See generally*, D.E. Nos. 23-39 at 188–200; D.E. No. 23-40; D.E. No. 23-41 at 5–37).

The Appellate Division denied this claim stating that Dr. Zaretski's testimony expounded upon the multitude of variables that undermined the accuracy of estimated times of death.  *See Kelly*, 2015 WL 3495642 at *6–7.  Moreover, the state court noted that trial counsel conducted a vigorous cross-examination of Dr. Zaretski on the issue of the decedents' time of death.  *Id.* at *7.

This Court finds that Petitioner has not demonstrated that the state court decision was unreasonable.  *See Matteo v. Superintendent*, 171 F.3d 877, 891 (3d Cir. 1999) ("[F]ederal habeas court must ask whether the state court decision represented an 'unreasonable application' of Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on

the merits, resulted in an outcome that cannot reasonably be justified."). Petitioner has not established that trial counsel did not investigate this witness. Petitioner has also failed to show that counsel's decision not to call Dr. Linares as a witness was anything other than sound trial strategy. The state court's application of clearly established federal law was not unreasonable. Therefore, Petitioner is not entitled to federal habeas relief on this claim.

### 2. Ineffective Assistance of PCR Counsel

Petitioner also contends that PCR counsel was ineffective for failing to adequately argue the ineffective assistance of trial counsel claim. (D.E. No. 1 at 15). Specifically, he argues that counsel's failure to obtain and submit affidavits from witnesses such as Dr. Linares to the PCR Court undermined the likelihood of success on those claims. (*Id.*). Petitioner submits that this omission is the sole reason for the PCR denial. (*Id.*).

There is, however, no federal constitutional right to counsel in PCR proceedings, *Coleman v. Thompson*, 501 U.S. 722, 752 (1991), and federal law prohibits ineffective assistance of PCR counsel claims in a federal habeas petition, *see* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *but see Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012) (holding that a prisoner may establish cause for the procedural default of an ineffective assistance of trial counsel claim by demonstrating that his or her counsel in an "initial-review collateral proceeding" provided ineffective assistance of counsel, thus creating a narrow exception to the *Coleman* rule that an attorney's errors in a post-conviction collateral proceeding do not constitute cause to excuse a procedural default). The Court will deny this ground because it is not cognizable as an independent ground for habeas relief.

### C.      Ground Two: Cumulative Error

Finally, Petitioner contends that the aforementioned alleged errors, in the aggregate, violated his constitutional rights.  (D.E. No. 1 at 18).  Respondents accurately note that this claim is unexhausted.  (D.E. No. 22 at 48).  Nonetheless, this claim fails on the merits.  *See Granberry v. Greer*, 481 U.S. 129, 131, 135 (1987) (noting that the exhaustion requirement is not a jurisdictional requirement to the exercise of habeas corpus jurisdiction over the merits of a state prisoner's claims and a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim.").

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process."  *Collins*, 742 F.3d at 542.  "Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process."  *Id.* (quoting *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)).

In addressing each of the claims above, the Court did not simply find that Petitioner was not entitled to relief on each ground; in fact, the Court found that the state court made no error under federal law on any of the aforementioned grounds.  These conclusion precludes a finding that the cumulative effects of the asserted errors resulted in some constitutional violation—no error means no error.  *See United States v. Herrera-Genao*, 419 F. App'x 288, 296 (3d Cir. 2011) ("Herrera-Genao complains only of the cumulative effect of the preceding claims; because we have found no error regarding those claims, Herrera-Genao's claim of cumulative error also fails.").  Hence, the Court denies relief on this ground.

**IV.**     **Certificate of Appealability**

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).  Applying this standard, the Court finds that a certificate of appealability shall not issue in this case.

**V.**     **Conclusion**

For the reasons discussed above, Petitioner's habeas petition is denied.  An appropriate order follows.

_s/Esther Salas_____
**Esther Salas, U.S.D.J.**